Mr. Lowry. Thank you, Your Honor. May I please support? We'd like to reserve five minutes for a vote. I thought I'd begin just by talking about the primary reference at issue here, the Japanese 910 patent and what it is. To do so, I thought just a real brief reference to the 503 patent. It's a cable that has twisted pair transmission media. So the transmission media are the twisted pairs and there's a separator that holds them apart. The Japanese patent is actually something different than that. It is a quad. So a twisted pair, you'd find it like in the telephone lines in a home, two twisted wires going like this. A twisted quad is essentially the same thing. It's also a transmission media except you have four twisted together. That's what the Japanese patent is about. It's not about putting these multiple transmission media into a cable. It's about the quad. What the Japanese patent does is it references an alignment problem in the prior art. So in the prior art, you could have individually insulated quads twisted together or you could have like a center insulator and you put the wires on the edges. The problem is, if it's not perfectly at the corners, you have electromagnetic interference. So they solved that alignment problem by putting just little bitty notches in the center core for the wire to sit in. And that's what they do to solve it. So what is the rejection? Just so I understand. So the four wires go into the four corner pockets on the central core. Correct, Your Honor. And then it goes into a twisting device. And the twisting device, I guess, in the Japanese patent, constantly changes directions like alternating current or something. So when that twisting occurs, there is the core kind of at the center and then there's the four wires that are fitting into the slots on the core. And something has to prevent, I assume, those four wires from just circling about each other, back up. So is there a plate at the entrance to the twister? Not exactly. So the way the twisters work, Your Honor, and I believe this is in Mr. Clark's declaration, they squeeze it. So if you think about it, it's kind of like sucking spaghetti in. It really doesn't matter where they are because they're in the pockets, it's squeezed together, they'll go in. And what Mr. Clark also says is because you're wrapping and unwrapping, you don't get the same... Right, I'm just trying to visualize. We have these four wires before they hug the core. And we have something in the twister that is turning this whole thing. So how is it that it is not turning the four wires, rotating all the way around like this before they hit the core? There must be a plate or something holding them. There's the buncher itself. It holds everything together. So why isn't it obvious that because there is going to be that inherent force from the twisting, to basically do as much as possible to keep the alignment as early as possible? A few things, Your Honor. There's no suggestion that you need to do it. It's not described in the reference. It's easy to come back and say, should we address it? But it's not described in the reference, nor is it described anywhere else in any prior art, or I'm sure it would be in front of first the board and now Your Honors. What is happening here is you've got it, it's twisting back and forth, so it's not like going round and round. So you grab it... By the way, is helical twisting just unidirectional, nothing, is that all it is?  Is it either the S or the Z, or is it something different from either the S or the Z? No, it's basically like a big thing that grabs it and goes back and forth like this. That's the SC one. That's the SC. I meant the helical one. The helical would keep going. That's not Japanese 9-10. Japanese 9-10 is SC. But a helical would just keep going in the same direction. But even then it's not clear that you would need to do anything. You would need to do this to do back twisting. Now there were things that were done. I mean the Japanese 9-10 patent talks about something about back stranding as another way to do it, where you would actually kind of pre-cook in this back twist. That would be a different way to do it. What's not shown in the prior art is what's in the patent, which is having this die in this location to prevent the back twist. So in order, and again, all the Japanese 9-10 patent says is there's this alignment issue. We solve it not by putting a plate in to prevent back twist. We solve alignment just by putting these little notches in. So what? I mean it does do it, right? No, I don't think it does. I mean all this describes the hole. The board actually found it's not described preventing it. The board found, as a matter of fact, that the Japanese patent does prevent the twisting. No, I believe that the board found that it doesn't describe that, but it would be obvious to have that, was the board's finding. And to get there, what the board had to do, as they said first, the Japanese 9-10 patent says we're solving this by putting the grooves in. And the board says, okay, but alignment is still a problem, notwithstanding that the only solution described is putting the grooves in, nothing more. So that's the first leap. The second leap is, okay, and we need to address this alignment problem by stopping the center piece from twisting. And to your Honor's point, let's suppose you've got wires coming in in the center one. If this is twisting like this, it's going to pull the wires over too, right? So why would you need to actually do anything? Maybe it's even harmful to do that. We're getting to the obvious because... I guess what I was thinking is the plate all by itself, by having four holes at the corners, is preventing the four wires from spinning around... But that doesn't take care of the spinning of the core. For the spinning of the core, you need the hole in the plate to hug that core to prevent it from turning on its own axis. Yeah, that wouldn't necessarily be the case, Your Honor, because first of all, because these are being held, you don't know how much twist is happening relative of any of these between the thing that's doing the twisting and the plate that's in front of it. So you could actually be doing harm by preventing it from moving to where it would be in alignment. There's no way to know. This is not simple stuff. I don't know about the Japanese patents in 1982, but at the time of the invention, these things are moving really fast. That's why this invention came about. So why is there a lack of substantial evidence for the Board's decision on claims one to four? So there's three areas that there is no substantial evidence. First, that alignment is still a problem. There's nothing in the reference that says that, and were the court to consider Mr. Baxter's declaration, he actually doesn't explain that either as to why that would be the case. The second would be, even if there were an alignment problem, it's best... What did Clark say about that? I'm sorry? What did Clark say about that? I believe he said that it's already solved with the notches and there's no reason to do something further. And by the way, Mr. Clark was unimpeached, at least by testimony. He wasn't opposed. And the second piece is, let's assume alignment is still a problem. You would need to address that by preventing twisting, even though there's not a description in the reference or any other piece of prior art that says you need to prevent twisting of that core member. The third step is, if you're going to have to address twisting of that core member, you should do it not the way it was done in the prior art, backstranding or whatever. You should do it in the way that the patent does it, by holding the core firm, and you should do it in the location that the patent calls for it to be done, rather than somewhere else. And without Mr. Baxter, there's nothing. With Mr. Baxter, there's still nothing because he doesn't explain it. And Mr. Clark goes on to address why you actually wouldn't do this. He says the SC stranding already provides a mechanism to address it. He says there's this issue with deformation, which is really remarkable, because what Mr. Clark said was, you'd deform this thing if you tried to hold it in place there. What Mr. Baxter said in response is, it's just the same as the patent. Now think about that, Your Honors. The patent is like this. You're holding this, so it's like holding the four corners of a cross. You can get a good grip on that and it's not going to move. Think about these little nubbins. It's like trying to hold the dimples of a golf ball, right? You just can't get a good grip on it because it's just these little dimples in it. And Mr. Baxter says it's the same thing. It's not credible, which kind of leads me to the... Well, that's the word. That's the problem for you. Credible. Well, substantial... Not credible. It's not substantial evidence. It's not credible. You want the board to disbelieve him. I would say, well, actually, I would like the board not to consider the declaration, because I'd just like to summarize what happened. That's a different point. Yes, and... But in terms of what the board credits, that's hard for us to set that aside, right? Hard, but not impossible, Your Honor. It has to make sense. I would respectfully submit. Or, if Your Honor simply wants to say, you know, it has to be fully explained is another way. But with respect to Mr. Baxter, and this is one of the things that strikes me as fundamentally unfair about what happened in this case, we have a petition that made none of these leaps that I just described. None of the alignment's still a problem, none of the need to address by stopping twisting, none of wouldn't use the prior art, you'd use what's in the patent and set, none of that. And then we get no declaration from Mr. Baxter. But surely the statutory procedure and the procedure provided in the regulations contemplates that evidence is going to be developed in the course of this process, that not everything has to be in the initial petition, right? I agree completely, Your Honor, but you have to have something there. You have to have fair notice that puts Belden, my client, on notice of what they need to put in their opposition. You can't put everything in the reply. Your Honor says that you had an opportunity to reply. No, Your Honor. Do you disagree with that? Yes, and I'd like to explain, Your Honor. You do. So what happens is the reply goes in with this 60-page declaration with all this testimony we've never seen before. Mr. Baxter hasn't even been identified. Hired before we filed our opposition, but not identified. We get this report, we get to cross-examine, and then we get to file five pages of observations. The cross-examination was after it had been filed. It was, Your Honor. And was that limited? It was limited to five pages of single-paragraph comments. I think the question is directed to the deposition of Mr. Baxter. You had hours of deposition of him, right? We had the opportunity to depose him. We did not have the opportunity to make any argument or submit any... But you did depose him, right? We deposed him. And you didn't even use up your full time, if I recall correctly. That may be, Your Honor, but that's not the point. We didn't have the opportunity to submit argument. Did you ask for it? It's not allowed for in the rules. You didn't even ask for a waiver of the rules, right? We weren't on notice of that because what the Patent Office says is we are not going to parse a reply, declaration. We weren't on notice. I mean, the rules are pretty clear as to how it works. You can depose him, you can file the observations. If you thought that filing the observations wasn't sufficient, why didn't you raise that before the Patent Office? It would have been sufficient had the Patent Office not considered new material, but the Patent Office did. So had they complied with the regulations, had they complied with the trial office guidelines, had they complied with their own order that they would not parse this declaration to see what's new and what's not? Do you think that's for the benefit of the patentee, or is that just a housekeeping rule? I think it's for the benefit of the patentee because there is no provision for the patent, well, and housekeeping, but there's no provision allowing a patentee to submit new evidence in response to this initial 60-page rebuttal report we've never seen before. I mean, we would have liked to, but it's not allowed. There's no provision for us to even argue the credibility of the witness. Well, after you deposed the witness and you filed five pages with the office... Of non-argument. Was there an opportunity to point out what you're telling us now? No, really, there's only the opportunity to provide... What was in the five pages? A citation to the deposition and a brief statement of what it's relevant to. Did you have oral argument? You're not permitted to raise anything that's not in the papers before an oral argument, so no. What does that mean? Does that mean that you couldn't, at the oral argument, comment on the Baxter testimony and say it was inadequate? To a very limited degree, we could, and you can't even have a slide on it because they will bump the slides if it's not identical to something that's filed in the proceeding already. So you could, at the oral argument, say the Baxter testimony doesn't do the trick. Here's what we discovered in the course of deposing. I could do that to a degree. I could do that to the extent it's already in the record. I could certainly not submit any responsive evidence. And just to be clear, you didn't file a motion for permission to file responsive evidence with whatever rule or waiver that might have required? Again, we believe that it should have been excluded in the first place, and I don't think that there's any regulation that permits that type of a filing. I'm sorry. I think I asked you whether you submitted a motion asking for permission to do that. Your answer is no. There was no motion of that type made, Your Honor. Okay. And, again, I believe the reason for that is because we were assuming that the rules would be followed. But, again, back to the point, there's not substantial evidence in the petition, or with Mr. Baxter I'd respectfully submit, and to come in and – I'm sorry. I think with that I should probably conclude. I've got about 30 seconds left. Okay.  We'll take your rebuttal, sir. Thank you, Your Honor. Okay. Over to you, Mr. Blake. Good morning, and may it please the Court. I will be speaking today about Belden's appeal and Burkett's cross appeal. With regards to Belden's appeal, there are two reasons why the Board's invalidity determination should be affirmed. First, substantial evidence supports the Board's finding that it was obvious to use the aligning Board 5 of J.P. 910 to prevent twisting motion of the core. That is the only limitation of Claim 1 of the 503 patent that is in dispute and that is argued is not in the prior art. It's preventing twisting motion of the core. Secondly – And the obviousness question itself is not a factual question for which we would use the word finding. What is the determinative factual issue that you think leads to the legal conclusion of obviousness? That J.P. 910 suggests using Board 5 to prevent twisting of the core. And that's essentially by shaping that center hole in such a way as to hug the core. Is that what we're talking about? Correct. So J.P. 910 has, and it is shown, it has what is called a wire-splitting Board 5. That is shown in J.P. 910 Figure 1. It shows a wire-splitting Board 5 through which the four conductors – 4A, 4B, 4C, and D – there are four holes at the corners through which those four conductors travel. And in the center, there is also a hole through which thread-like object 1 ultimately passes. The Board found that J.P. 910, quote, viewed as a hole, teaches the importance of avoiding any misplacement of the conductors in relation to the core. That's at A26. J.P. 910 teaches and discloses that the core must be shaped so that its, quote, grooves are placed so that their bottom portion align to the vertices of a square. That is at A215, paragraph 3. And so the Board, Board 5, not the Board, Board 5 must have the four holes that are placed at the intervals of 90 degrees through which the conductors pass. And it also has a hole in the middle through which the thread-like object, or the core, passes. And the Board found as a factual matter that, to one of ordinary skill in the art, based on the reference itself, that the hole, which is simply a hole, it's a hollow space, it can be shaped any way possible. It doesn't necessarily have to be round. It's a hole. The Board found that it would have been obvious, in light of the teachings of J.P. 910, to use that hole to prevent the twisting motion of the core. Just so I understand it, I guess, which is I think where I started. The point is that that hole should look like a cookie cutter holding the cookie with the core outline, the cross-section of the core, forming this shape of a circle with dimples in it. And the way to prevent, to use Board 5 to prevent the twisting, is to have that hole hug that shape the way a cookie cutter hugs the shape of a cookie. You're making like a Christmas tree or something. Right. The core can be any particular shape. In this particular embodiment, in the patent, it's showing the shape of the core that has the little recesses in it for purposes of holding the conductors. Yes, you're right. That would be roughly the shape of the hole in the Dive 5 to prevent that core from twisting. Correct. And that finding rests on Mr. Baxter's declaration, ultimately, that there is a twisting problem to be solved? No. No, I would respectfully submit that that finding does not rest on Baxter at all. That finding rests on the teaching of JP-910 itself, and it also rests, which Mr. Lowry did not touch upon, that the 503 patent here specifically says that back twist, the 503 patent, the patent in suit here in the specification, when it is talking about the embodiment that is the method of Claim 1, the 503 patent specifically says that back twist, quote, is inherent in bunching operations. And the bunching operation is the portion of the process that happens at the SC strander in the case of the 910 patent or in the case of the 503 patent when all of the constituent parts are finally joined together. The 503 patent tells us that when that happens, and it's in the prior art, that this phenomenon called back twist occurs, which propagates back through the process, including through the core. So in the prior art, it's telling us that there's a problem of this back twisting, and that's the whole purpose of the 503 patent is to prevent twisting, including back twisting. So I would say that it's not just in the Baxter Declaration. It's in the patent in June. But it is also in the Baxter Declaration, right? It is also in the Baxter Declaration, also explain that JP910 is concerned with alignment. That is correct. That's in Baxter, paragraph 118 and 121, at A696 through 697, 698. And the Baxter Declaration does also explain that the only way to accomplish the alignment at Dye 105 is to prevent the twisting motion of the thread-like object 1. Yes, Baxter does say that. Unless there are further questions about Claims 1-4, could you talk about Claims 5 and 6? I look at the board's decision, and it seems to me that it gives three reasons as to why Claims 5 and 6 were not obvious. One, that if you used twisted pairs, you'd have a circularity problem, that there wouldn't be any reason to jacket if the twisted pairs were already insulated. And third, the SC configuration. Yes. The latter point, it seems to me, is not addressed in the Clark Declaration. In the, I'm sorry. In the Clark Declaration. In the Clark Declaration, correct. That's correct. So, I'll take those in order. Your Honor is correct that the board stated, talked about, the board stated that ERC-TEC has not responded to Belden's argument that modifying the cable of JP 910 to include twisted pairs would destroy the circular shape of JP 910's quad wire. The conductor and... Why do you understand that circularity is important? I don't think circularity... I don't necessarily think circularity is important, but if it is important, the circularity of the Canadian 046... Is circularity a limitation of the 503? No. It is not. One might ask, why are we talking about it? I'm just trying to respond to your question, but it is not a limitation of any of the claims of the 503 patent. Moreover, the reference that we're arguing should be combined with JP 910, that is, Canadian 046, is the exact same cable configuration as in the 503 patent. It is four twisted pairs that are separated by a cross-shaped separator. Each of the four twisted pairs reside within the recesses of that cross-shaped separator. But 5 and 6 have specific additional limitations. Don't you have to concentrate on those and tell us why? If our standard is substantial evidence, despite the fact, as I understand it, that the board's decision is made on a preponderance, then I think for 5 and 6 it isn't the general cross with notches or holes, but the specific differences that the board found were sufficiently significant to hold that there wasn't a preponderance of evidence. Right. So the claims 5 and 6 require that the transmission media of claim 1 specifically be twisted pair conductors. That's the... In claim 5 it requires a plurality of twisted pairs as the transmission media of claim 1. In claim 6 requires that it specifically be four twisted pairs. And I think you agreed that those specific limitations were not in either the Japanese or the Canadian reference. So why, nonetheless, was the board wrong? That specific configuration is in Canadian 046. Canadian 046 shows... Well, that's a disputed fact, is it not? I don't think that's actually a disputed fact. I think the parties agree on that. I think our position is that the board misapplied the law. Our position is the board misapplied the law with respect to claim 5 and 6 because what the board did was it looked at JP910  as a conventional method for manufacturing cable. And JP910 talks about the cable that is manufactured by that process as being... by the JP910 process as being unconventional or something that's different from the conventional process. There should have been a matter of anticipation that the board held that it was not even obvious. Could you come back and maybe tell us... address the reasoning as to why it wasn't obvious to combine the Canadian patent with the Japanese patent in this respect? You addressed the first one, the circularity. What about the second one about the motivation? The second one being the... Because the twisted pairs are already insulated, there wouldn't have been any motivation to jacket the entire cable. I have great difficulty understanding that. I mean, the jacketing would be designed not so much as insulation but to keep the four twisted pairs in place, right? That's exactly right. In fact, the 503 patent has the twisted pairs which in and of themselves are insulated and then it is jacketed. So, there's no redundancy. The 503 patent is telling us that it's... And the same for the 046 patent. It is in the prior art to both insulate the individual conductors and to jacket them. That is in the prior art. There is no redundancy between having a jacket... Jacket them together with the core. Exactly. So, you have the core going through the center and then you have the individually insulated conductors around it and then you have a jacket around it to hold the whole thing together. And in some cases, that's the purpose of the jacket. And what they said was, well, having insulated the twisted pairs, there wouldn't be any motivation to jacket it which seems to me not to make any sense. I agree that it doesn't make any sense and it's contrary to what's in the prior art and it's contrary to the 503 patent itself. What about the third reason, the SC? So, the third... Our position is that, in terms of the legal error, that the board did not... Put aside the legal error. They came up with this item, which isn't in the Clark Declaration, as a reason for not doing this. Isn't that just an additional step that you could or could not take with respect to producing a cable of this sort? Yeah, well, first of all, SC stranding is not part of the claims of the 503 patent. The claims don't require any particular type of twisting and SC stranding is just a different way to twist as in contrast to or slightly different than helically twisting. So, it's not even part of the claims how the twisting is done. The claims simply require that there be a prevention of twisting irrespective of the type of twisting that might occur. Okay. We'll save your rebuttal time on the cross-appeal. Let's hear from Mr. Lowery on the cross-appeal. Thank you. Thank you, Your Honour. I'd like, I guess, to begin on Claims 5 and 6. I think this is also... Can I just ask you? This is, I guess, my understanding of the relationship here, so tell me if this is wrong. I took it that the other side's basic argument against what the Board did on 5 and 6 was that the Board didn't consider the independent force of what it had already found about JP 910, namely the teaching of the suggestion of the need for alignment and the suggestion of using the plate to prevent twisting in order to improve the possibility of alignment, which was the core of the Board's ruling on Claims 1 through 4. And if you take that teaching and apply it to 5 and 6, you get to the same place, and the only reason the Board didn't was that it forgot about the independent force of the teaching about the alignment-twisting connection and instead looked at everything in the embodiment in 910, the SC, Strander. But that's an incorrect obviousness analysis. You have to take each teaching of the 910 for what it's worth, and they already established that for Claims 1 through 4. And that equally applies, of course, no matter what you're assembling, whether it's twisted pairs or anything else. The insulation has nothing to do with whether there's an interest in alignment and preventing twisting. So, I'm not sure, that was a long question, so I'm not sure I've got the nub, but I think so, Your Honor. And I think what the Board found was that they hadn't established even a prima facie case. First, they hadn't even established a prima facie case of reason to combine. What the Board did is it said in the context of JP 910, we have this teaching about quads, right? And twisted pairs and quads, these are the transmission medias, as I talked about up front. So, when we talk about combining one reference where you're talking essentially about making a cable, as the Canadian one is, similar to the Clark, I mean, they're both multiple transmission media with a separator, they said, you wouldn't look over here to a method of making the twisted pairs. Well, the twisted pairs were absolutely conventional, right? So were quads. Right. And JP... So, the Board, am I correct, that the Board gave three reasons as to why you wouldn't apply the JP 910 to twisted pairs and those are the three reasons that I went over with opposing counsel? Am I correct about that? I think, Your Honor, I would not characterize it in the same way, respectfully. The first was that the Board said there's no prima facie case on why to do it. So, one doesn't start the analysis with why wouldn't you? One starts with what common sense reason or whatever is there and the Board said... The prima facie case is that it was absolutely conventional to have twisted pairs as well as quads and that it would have naturally occurred to somebody to substitute one for the other. That may be, but they wouldn't do that with a cable. So, it's like what the combination is doing is saying, let's take a twisted pair and for each line of the twisted pair, let's put a twisted pair in it. It doesn't make sense, which is what the Board found. I don't understand what you're saying. So, if one opens up a wall in a house and looks at the telephone line, there's usually two, two twisted pairs. Each is the transmission media. It's not the individual copper wire. Each twisted pair is the transmission media and you open it up and they're different colors so that you can tell which line is which. So, the cable is jacketed around the transmission media, multiple ones, multiple twisted pairs, could be quads. It's not conventional, it's not used very much anymore, but quads and twisted pairs are equivalent. So, the cable is multiple transmission media of twisted pairs and what the combination suggests is we're going to take a twisted pair and put a twisted pair in it or we're going to take a quad and put a twisted pair in each of the elements of the quad. And it's talking about apples and oranges. Cables are different than quads and twisted pairs and that's what the Board found in that one would not simply look at how you make a twisted pair or how you make a quad and apply that and there's no reason articulated, as the Board found, to make a prime facie case to do so. I mean, there's nothing in any of this art in front of the Board about how you make a cable. I mean, a cable with multiple transmission media as opposed to how you make a twisted pair or a quad. I mean, Japanese 910 is quite explicit. We're talking about twisted pairs or quads is what it actually says. And so, the first point would be no prime facie case. The second point on circularity, it wouldn't be held, and it's similar to the already jacketed. It's like we're talking about insulating the individual wire. I don't care whether it's circular. It's not a claim limitation. Where does that come from? It comes from combinability, Your Honor. What does that mean? So, for the obviousness rejection, you need to look at the references you have as a whole. You don't pick apart references under this Court's precedent. You look at it as a whole and you say, would one combine these two things? And the answer is... Let me, I guess, disagree with that. It seems to me that's not what the rule against picking apart references means. The rule against picking apart references is about making sure we are accounting for everything that the reference teaches. And if it teaches four independent things, each of those teachings counts, unless it teaches that these four things really aren't independent. That's why I tried to say how I was thinking about this in my opening question, five and six. It seemed to me that what the Board was doing here was saying, we already found that 910, Japanese 910, teaches about the alignment, twisting connection. Now, we're not going to take that teaching for its own independent force. We're going to tie it to the particulars that 910 talks about, about uninsulated wires and quads and other things. And I don't understand what in 910 forces you to deny the independent force of the alignment twist connection, which, if you take it independently, seems to me to lead to five and six having the same problem as one through four. The problem, Your Honor, is that the references, again, are apples and oranges. One is with respect to twisted pairs and the technology to make those. And the Board said it's not so simple as applying it across to, or quads, as applying it to these methods of manufacture of cable. There's actually... Is the Canadian patent one that describes taking a plurality of twisted pairs and putting them together and maybe helically or otherwise wrapping, combining them and then wrapping them? I don't believe that there's a method of manufacture described in that. It describes a resulting cable, and I know it doesn't have SC stranding, which, Your Honor... No, but it has a plurality of twisted pairs being put together with a separator of one sort or another. And as it's being put together, is there turning going on or not in the Canadian patent? I believe that it is helically twisted, but it's unclear, Your Honor, how it's made because I believe that, if I recall correctly, that center helical piece... Let me stipulate that it doesn't talk about the manufacturing process. I took it that their argument, and at least one sentence in the institution decision, said it would have been obvious to a person of skill in the art, starting with the Canadian product and thinking, how am I going to make this to address the problem of alignment with the separator in exactly the way that the Japanese 910 patent teaches? I took it that that was the case for obviousness of the combination, which starts with the Canadian and then uses the Japanese in order to establish a manufacturing process for the results shown in the Canadian. I think, actually, it kind of... The analysis ran both directions. I agree it ran both directions, but that was part of it. The other direction is harder for the other side. Right. If one's looking at the direction of... There was actually no evidence about how one would go about making, other than the 503 patent, which is the patent, about how one would make the cable described in the Canadian one. One could, for example... In fact, Your Honor, there were cables with multiple things in them before, and there were methods of addressing that. For example, one thing... One of the prior art things, I believe, is you kind of build in a back twist all the way back when you're making it. So rather than stop it from twisting, you kind of build your thing so that it allows for the twist already. That's why these things are so dangerous in the absence of actual prior art and evidence, because there's a lot going on in these things that's not apparent. I mean, nobody's describing it. Nobody's actually said somebody actually did it this way. This cable was made... If that Canadian cable was made before, there's no evidence as to how it was actually made. There's no evidence actually that you could even make that cable in this way, given the materials. I don't know. I haven't looked at that. But what the board said was you would not take a reference on how to make twisted pairs and simply say, okay, I'm going to use four quads in the Japanese patent case, and I'm going to use that to make a table. Because it's different. It's a different thing. It's different speeds. You don't have bare wires coming in. You have twisted pairs coming in. You don't have... All the components are actually different. The jacketing is different, right? I mean, the JP-910, when it puts a jacketing on, it's putting on something very tight, which is different than the jacket you would find on an outside table. But the suggestion that there was no motivation to jacket is ridiculous, right? No. I think what the board is saying is that these things are different and they wouldn't be combined. We don't think that they should be combined. I think we find that they shouldn't be. Okay. Thank you. Let's hear a couple of minutes of rebuttal, and then we'll hear from the office. On the cross-appeal, please. Unless your honors have questions, I have nothing further. Okay. Thank you. Thank you. All right. Ms. Lynch, representing the director. Thank you, your honor. May it please the court. I just want to talk about two of the procedural issues very briefly. The first is the board's denial of the motion to exclude the Baxter Declaration. And Belden says that that was an abuse of discretion. But to the contrary, the board followed the office's regulations, which state that a reply may only respond to arguments raised in the corresponding opposition or patent owner response. But I think you may have to explain to us why we should support a regulation if we think that for some reason or other it's deficient in due process or whatever it is, the principles, to support the credibility and strength of this new board procedure. Okay. 316, the statute specifically states that the petitioner is provided with at least one opportunity to file written comments within a time period established by the director. And so pursuant to that statute, the board has allowed the petitioner to put in a reply. In this case, the petitioner put in a reply with a Baxter Declaration. And Belden said, well, no, that's not a fair reply because Mr. Baxter didn't put in a declaration with the original petition. They said it was inadequate because they were only allowed five pages and had no opportunity to argue. Yeah, I think that's really the heart of the problem. They're saying that your limit on the observations, that they do get the deposition of Baxter, which they took advantage of and didn't use the full time, but what they're saying is the limit on the nature of the observations is inadequate. And what is your answer to that? Is it that they can make the argument at the oral argument? A couple of things, Your Honor. First of all, they could have asked for more pages of observations if they had chosen to. They could have asked the board to allow them to do a sir reply. They also chose not to partake of that. I've gotten such requests thus far have never been granted. I think experienced practitioners perhaps know that there's no point in asking for something you're not going to get. The board has actually granted sir replies in a few situations. And they're complaining without having asked. So we don't know whether the board would have granted it in this case, but they certainly didn't ask for it. Are you complaining about a rule which says this is it? We're talking about the observations which were originally five pages and they could have asked for additional pages or they could have asked for a sir reply. They did neither of those. But what they did do was they did take the deposition. They did file some observations and they had an opportunity at the oral hearing to say what they wanted to say. Can I just ask, has the board or the director or somebody in the PTO written down something that would constitute notification to the bar that requesting permission to file a sir reply or requesting more pages or making any of these requests is possible or is that just something that they would have to, why not unless something is forbidden? Right. I don't think that there's anything specifically in the trial practice guide that says that, but certainly the board can waive its rules and other people have asked for it so they could have asked for it. Can I ask you a question about the trial practice guide? I take it the primary maybe position is it's just not binding, so roughly speaking, who cares what it says. But would you agree that the portion of the trial practice guide that seems to say that new evidence that could have been presented in a prior filing is inappropriate for a reply would mean that Baxter's declaration under the guide, if it were binding, was inappropriate? No, I think what the trial practice... You could have presented all of that. Well, actually if you look at the motion to exclude the Baxter declaration and the opposition to it that Burtek put in, Burtek actually went paragraph by paragraph explaining how the Baxter declaration responded to the Clark declaration. Because the Clark declaration... Let me just try to be precise and I'm not sure that this matters because as far as I can tell, the guide simply isn't binding. Let me stipulate for purposes of this question that everything in Baxter was materially responsive to Clark and therefore satisfied the regulations. I'm talking only about the way this guide is written. The guide seems to say that evidence on reply is inappropriate if it could have been presented earlier. When in the world would that not be true? I think... But what the board also says, and maybe this isn't in the trial practice guide, what the board also says is the petitioner can't anticipate every argument against them. So obviously you're right, you know, but then petitions would be... They couldn't have provided a response to Clark earlier. They could only respond to Clark once Clark put in his declaration. Correct. Now maybe they could have guessed those things ahead of time and put them in, but that's not the way it works. Well, they were challenging Claim 5 and Claim 6 and they needed to say, here is why a relevant skilled artisan in whatever the year is would have been led to that, would have been starting with the very common phenomenon of twisted pairs being grouped together and jacketed with a twist in them and there's an alignment problem for that. It is, after all, the petitioner's burden to make out the facts necessary to support the inferences that lead to the conclusion that, by a preponderance, that a relevant skilled artisan would have been motivated to do this. It's the petitioner's burden to meet what the statute says and what the regulations say and to convince the board that there's a reasonable probability that at least one of the challenge claims would be unpatentable. No, it's the petitioner's burden, isn't it, in order to come away from the board proceeding Oh, at the end. Yes, with a success to establish invalidity of the claims by a preponderance of the evidence. Correct. But I still think this comes back to the point that the board is policing these replies to make sure that they are responsive to the opposition or the patent owner's response. But if there is new stuff that is raised in a reply, for example, Baxter responding to Clark, I must say I don't quite understand why the observations are so limited and why the patentee is not permitted to make some sort of argument  that it's taken in this case of Baxter. I mean, any consideration being given to loosening that limitation on the observations? I don't think that that's in... There are proposed... There's a proposed rulemaking right now. I don't think that that's one of the provisions in it. But certainly, you know, they can put things in their observations and then they can continue to argue them at the oral hearing. Yeah, but I don't understand why you don't allow them a little latitude in terms of argument in the observations. That doesn't seem to me that that would louse up the schedule here. Well, that's the way the system has been set up and it's supposed to be narrowing the issues. And like I said, if they needed more pages for observations, they could have asked for them. They could have argued at the hearing. They could have asked for a reply. But you can't be saying that this is how it is. I think our observation of the board's activities and the director's response to various issues as they are resolved is to assure, as well as the board can, that the requirements of due process are met so that the purposes of the statute can be satisfied. But I hear you saying, no, this is how it is, that isn't. I don't mean to be saying that, Your Honor. What I'm saying is I think in this case, there was nothing brand new in the board decision. The board relied on the references and the Baxter Declaration. Belden had full notice. We're not asking you or the director to defend the decision. I understood that you wanted to explain to us the procedures that were followed and why there was no flaw in the procedures whereas we have been told that perhaps there was in this limitation on argument after the reply, if the reply was provided and presented by the board. The board had to read it in order to decide that it should be cut back. So there was certainly an opportunity for influence from the reply. Correct, Your Honor, but we think that that's how these trial proceedings are supposed to work. The institution decision should be different from the final written decision because of everything that happens in between and we also think Belden had full opportunity to reply to the Baxter Declaration. The court has nothing further. I apologize for going over my time. No, we should consider all this. Thank you. The case is taken under submission. That concludes the arguments for this morning. All rise. Thank you.